486 So.2d 1334 (1986)
J.M. ALDERMAN and Belle Alderman, Appellants,
v.
John D. MURPHY, Donald M. Roberts and Sharon Roberts, His Wife, Ernest Poux, and Martin County, Etc., Appellees.
No. 85-526.
District Court of Appeal of Florida, Fourth District.
March 19, 1986.
Upon Motion for Rehearing and Clarification May 7, 1986.
Hubert R. Lindsey and Edna L. Caruso of Edna L. Caruso, P.A., West Palm Beach, for appellants.
Douglas E. Thompson, of Farish, Farish & Romani, West Palm Beach, for appellees, John D. Murphy, Donald M. Roberts, Sharon Roberts and Ernest Poux.
GLICKSTEIN, Judge.
Defendants appeal from an adverse final judgment. We affirm the final judgment as to the plaintiffs Murphy and Roberts, and affirm the finding of liability of the defendants to the plaintiff Poux, but reverse the award of damages to him and remand for new trial, as to him only, upon the issue of damages.
*1335 Each of the plaintiffs owned land in the vicinity of land held by the Aldermans. In their complaint, they alleged that by stopping and plugging the natural flow of water in a drainage ditch from their respective properties to the Aldermans' property, and by building dikes along the south and east boundaries of the Aldermans' property, the defendants had caused surface water to stand on the plaintiffs' respective properties, and, especially during heavy rainfall, their lands were flooded. They sought injunctive relief and damages for, among other things, livestock and pets lost, and damage to homes and contents. They further alleged nuisance and trespass resulting from the Aldermans' conduct. Poux' claim stated that the damage to him included loss of approximately 700 chickens, damage or death to three goats and ten hogs, and damage to miscellaneous personal property. The defendants denied they had plugged any drainage ditch and denied any ditch could be a natural watercourse, stating that any ditch on the defendants' property referred to by plaintiffs had been built by the defendants and others for the purpose of draining the defendants' lands. They admitted constructing, in 1964-1965, a complete drainage system on their own lands, including dikes, ditches, and a flood water storage area, together with a pumping system towards the west in concert with others, to make their land suitable for a productive citrus grove, since developed. They stated their drainage system construction had no effect on existing drainage. They denied interfering in any way with the lands of any of the plaintiffs, alleging these were low-lying and subject to flooding in times of high water. They said any harm suffered by the plaintiffs came from natural causes and the plaintiffs' failure to protect themselves, or from conduct of persons other than the defendants.
The defendants further said there was no drainage plan or incursion, or easement or the like, for any of the properties of the plaintiffs when an abstract of title was examined at the time the defendants bought their property. They also alleged that inadequate drainage afforded for Fox Brown Road by Martin County caused the flooding on the plaintiffs' property; and that Martin County did damage to defendants' property by removing some of their dike without authority, during the time of heavy rainfall. Finally, they said there was also an old roadbed of unknown origin, to the south of the lands of the plaintiffs, that impounds waters that would otherwise flow naturally to the south.
Subsequently the defendants filed a third-party complaint against Martin County; Martin County filed an answer and a counterclaim; and the defendants answered the counterclaim and crossclaimed against Martin County, which Martin County answered. The case was tried to a jury over a two week span, at the end of which verdicts were returned in favor of the plaintiffs and Martin County and against the defendants, upon which the trial court entered final judgments. This appeal followed.
As we have said, in his complaint, plaintiff Poux alleged loss of 700 chickens, three goats and ten pigs as well as miscellaneous damage to personal property; however, he testified at trial that because of the flooding resulting from Hurricane David he lost practically all his chickens  7,000  seventy pigs, and he did not know how many goats. He had bought ten, but his wife and children also had goats. As we shall discuss this poses no problem here because of the defendants' failure to object.
However, when Poux started to testify that he lost the whole property  forty acres plus the house  because as a result of the flood he could not pay the mortgage, the defense objected on the ground these were remote and special damages that had to be pleaded and were not. Plaintiff's counsel said this loss had been stated by Poux in response to defendant's interrogatories propounded about a year earlier. (The court also asked as to the chickens, in *1336 essence, how the 700 became 7,000. The plaintiff's counsel's answer was that he thought it was a typographical error of Poux' previous lawyer, who prepared the complaint.)
Appellants/defendants' objection was overruled. Poux resumed his testimony. He said that the livestock was the sole source of his livelihood, and loss of the livestock made it impossible to maintain the mortgage payments, and the farm was lost. He said he had paid about $50,000 on the mortgage and down payment. Poux also testified he had never told the lawyer who prepared the complaint, the number of livestock lost that are mentioned in the complaint, as he never met the lawyer. On cross-examination Poux said the down-payment was $12,000 and he made mortgage payments on a note for about $70,000 at a monthly rate of about $245 or $247, for more than a year.
Exhibits placed in evidence by the defendants include 1940 and 1952 aerial photographs of the properties involved in this suit. The defendants' property is much larger than the properties of the plaintiffs and lies generally to the north and the west of those properties. To the east of all the subject properties is Fox Brown Road, a north-south road belonging to the county.
The 1940 aerial photo shows the lands to be generally low-lying and flat. There is a large pond on what are more recently the Murphy, Roberts and Poux properties. The large pond has an outlet toward the south. None of the Alderman property is south of the plaintiffs' parcels. The 1952 aerial photo shows more generalized but apparently shallower water extending on both sides of the section's southern boundary. The section boundary is also the southern boundary of much of Poux' land. Murphy's and Roberts' lands lie to the north and east of Poux' land.
According to the record, the elevation at a benchmark on Fox Brown Road, east of the properties, is between thirty-nine and forty feet. The Aldermans' land at its southwest corner has an elevation of about thirty-four feet. At a point about midway between those just mentioned, which point is along the section boundary where Poux' land abuts the Aldermans' land, the county removed a plug after Hurricane David flooded plaintiffs' properties; and witnesses who were present said water at once began flowing west from Poux' property into a ditch at the south end of the Aldermans' property. There was testimony indicating water could not flow eastward from the plaintiffs' properties because the land to the east was higher in elevation.
John Joseph Toniole was the owner of the Poux property prior to Poux' purchase of it. According to Toniole's deposition, which was wholly read into the record, except for portions to which the defendants objected, the natural flow of water was from his property into Kreiser grove and then across the Aldermans' property to canal 710 and on to Lake Okeechobee.
The defendants' expert, Ken Harris, was the one who testified that Fox Brown Road was higher than the southwest corner of the Aldermans' property and that water will not flow uphill. It was his opinion water from the plaintiffs' land naturally flowed south through a little slough. When excess water caused the slough to overflow, the water would flow to the southwest corner of the Aldermans' property, because it was a low point. Harris admitted the Aldermans had built dikes along their south and lower east boundaries to prevent water from the plaintiffs' lands from intruding on the defendants' land. Harris' deposition indicated had there not been those dikes water from heavy rain backing up on the plaintiffs' properties would have flowed toward the Aldermans' property and run off onto it.
Leonard Lindahl was Martin County's expert witness. In his deposition he said the general drainage pattern in the area was southwesterly, and that the plug at the point on the Alderman/Poux boundary near the southern section boundary prevented *1337 drainage from the plaintiffs' property into the Aldermans' property. At trial Lindahl testified the natural flow of water without any modifications, based on the contour lines, would be first southwesterly into a low area on the plaintiffs' property, and, when that filled up, in a southwesterly direction towards the low point in the southwest corner of the Aldermans' property. He reiterated this point on cross-examination.
J.M. Alderman testified that after acquiring the land in 1964 he built the considerable drainage facilities mentioned in the defendants' answer. He admitted that at one time there had been a culvert from east to west at the point where the county removed the plug after the hurricane. The culvert had been installed through the newly constructed dike so that in the event of heavy water the dike would not be washed away. Eventually, Alderman took the culvert out. When the culvert had been in place, water would have flowed from Poux' property into the Aldermans' drainage ditch and on toward the west. In his deposition, Alderman said he built his dike system to keep his new citrus groves from flooding and to impede the flow of water into his lands from the plaintiffs' lands.
Plaintiffs Murphy and Roberts both testified that when the plug was removed the water on the plaintiffs' lands receded. Roberts said the ground level around his house was naturally higher than the ground level where the plug was.
The issues, restated, are:
I. Whether the trial court erred in sending to the jury the question of whether defendants blocked the natural flow of water from the plaintiffs' properties, as there was no substantial evidence on which the jury could base its verdict. We conclude that it did not.
II. Whether the trial court erred in permitting the plaintiff, Poux, to testify to certain special damages, when the defendants objected on the grounds those alleged damages were not pleaded in the complaint and were also remote. We conclude that it did.

I
The first issue in this appeal is whether the trial court could properly have sent to the jury the basic issue of whether the defendants, the Aldermans, had blocked the natural flow of water from the plaintiffs' lands. The defendants urge there was no substantial competent evidence on which a jury could have based a verdict to this effect. Testimony and other evidence summarized above demonstrates there was such evidence, such as (1) the fact that contour lines show lands to the north and east in the pertinent area are a few feet higher in elevation than contour lines in the southwest corner of section fifteen, which is also the southwest corner of the Aldermans' property, (2) Mr. Alderman's own comments about why he had the dikes constructed and about his closing of the former culvert, and (3) the result of removal of the plug. In our view, there was competent substantial evidence on which the jury could base its conclusion the Aldermans had blocked the natural flow of water from the plaintiffs' lands. As appellants say, the test for the appellate court is merely whether there was substantial competent evidence to support the verdict.
It may be that there was, as appellants contend, a certain infirmity in the complaint. We refer to the fact that a ditch is by definition artificial, so that blockage of a ditch would not logically be blockage of a natural water course. At this point, however, that argument is academic. The defendants did not raise this point previously in circumstances that could require either dismissal or amendment of the complaint, and plaintiffs amply made it appear that the defendants' conduct obstructed the natural flow of water from the plaintiffs' lands. The defendants' selection of and focus on testimony that fails to support the plaintiffs' allegation, or that opposes it, *1338 cannot overcome the existence of evidence that supports the plaintiffs' allegation.

II
The second point on appeal has two aspects. The first fails because of non-objection at trial. It concerns the complaint's specific mention of the loss of only 700 chickens, three goats and ten hogs, in contrast to Poux' testimony that he lost 7,000 chickens, over seventy pigs and ten goats. While these figures greatly exceed those mentioned in the complaint, appellees correctly point out there was no objection by the defendant and maintain, therefore, that it is too late to raise the issue now. Appellants did cross-examine Poux on these losses, and what the jury concluded as to the extent of these losses is anybody's guess. We agree with appellees that it is too late to question now the admission of testimony on a greater number of livestock than was stated in the pleadings.
The second aspect has, in our view, merit enough to warrant relief. Poux testified that he depended on his livestock for a living, and that because of the loss of the livestock he was unable to make the mortgage payments and ended up losing the farm which consisted of forty acres and a house. Included in the damage award must be the amount of Poux' deposit on the property  $12,000  plus his monthly payments of $245 or $247, which he had paid for some period greater than one year but apparently not as long as two years. Poux said the amount was $50,000, but mathematically that cannot be. Appellants did promptly object when Poux' testimony turned to the loss of the farm. The defendants' counsel objected on the ground Poux' counsel was asking about remote damages not specifically pled. He said such damages were not general and were just too remote. The objection was overruled.
Appellants point out that Florida Rule of Civil Procedure 1.120(g) requires specific statement of items of special damage. While they believe the loss of the property is too remote to be claimed at all, they contend the loss at least is a form of special damage and could not be raised unless pleaded. They cite the case of Ephrem v. Phillips, 99 So.2d 257 (Fla. 1st DCA 1957), to support this stance.
In Ephrem, a personal injury action, a woman injured in an automobile collision also claimed damages for pain and suffering resulting from a miscarriage that purportedly was brought on by the accident. The appellate court found that, contrary to the defendant/appellant's position, the harm thus claimed was not an item of special damages that had to be specifically alleged in the complaint, apparently because the aggravation of a woman's pain and suffering resulting from the accident, by the resulting abortion, could reasonably have been expected to follow the accident. In reaching this result, the appellate court recited, as a principle of Florida law, "that damages for such special losses or injuries as do not naturally or ordinarily result from the negligence alleged may be shown only when the defendant has been advised of them by special allegations in the complaint." Id. at 260. The appellate court stated that no allegation of special damages is required where only such damages as may reasonably be expected to follow the injury are claimed. Id. at 260-61. Elsewhere in Ephrem the court seemed to imply that, thanks to modern discovery procedures, either it is unnecessary to plead special damages, or failure to plead them is harmless error, absent surprise or prejudice to the adverse party. Id. at 260. However, in denying the petition for rehearing in the Ephrem case, the First District Court denied that this is so. The court stated in so many words that admission of evidence of special damage not specifically pleaded is, as a matter of law, reversible error, as actions at law must be tried on the issues made in the pleadings. The court explained that the damages in question in Ephrem fell within the pleaded allegations, and defense counsel's knowledge *1339 of the claimed damages in no way affected the admissibility of the evidence. Id. at 263-64.
In Bialkowicz v. Pan American Condominium No. 3, Inc., 215 So.2d 767 (Fla. 3d DCA 1968), the plaintiffs appealed, contending the trial court erred when it disallowed proof of damages other than those actually done to the plaintiffs' property. The basic allegation was that pile driving and construction on adjoining land had caused damage to the plaintiffs' building. The plaintiffs were not permitted to prove bodily suffering including heart attack and physical inconvenience that allegedly also resulted from the trespass or from negligent pile driving on the adjacent property. Their pleadings were silent on both the heart attack and the physical inconvenience.
The appellate court affirmed the trial court's exclusion of testimony on these matters. Citing, inter alia, rule 1.120(g), Florida Rules of Civil Procedure, and Ephrem, the court said the basic rule was that if special damages are not specially pleaded, evidence of them is inadmissible. The Bialkowicz court stated that although in such a case a heart attack can occur from the ambient noise and contact with the defendants, as Bialkowicz claimed, "damages of this sort do not naturally and ordinarily result from a trespass and/or a negligent installation of supporting piles. These damages are special; their very character requires that opposing counsel be apprised of their existence in order to be prepared at trial." Id. at 770. Yet the first these damages or the inconvenience was brought up was when Mrs. Bialkowicz testified at trial. They were not mentioned at pretrial conference, in the pretrial order, the requested jury instructions, or the complaint as amended. Id. at 770-71.
Appellees seek to rely on the above to support their view that if the damages here in contention were special damages, they could be brought up at trial as there was no surprise. Poux had mentioned the involuntary loss of his land in response to the defendants' interrogatories almost a year earlier. However, the Ephrem opinion, upon rehearing, correctly states the law; and mere lack of surprise will not permit admission of evidence of special damages not specially pleaded. We must therefore consider whether the loss of the farm should be classified as special or general damages.
The proper question, paraphrasing Bialkowicz, is whether damages of this sort naturally and ordinarily result from a trespass of the kind that occurred here, nuisance as alleged here, or negligence on the part of the defendants, in preventing the natural runoff of water from the plaintiffs' lands.
In Bialkowicz, as already noted, a heart attack and physical inconvenience were held to be special damages that do not naturally and ordinarily result from the trespass that occurred there, or from the negligent installation of piles, on the adjoining property. Prosser tells us that a curious survival and extension of an early notion of strict liability for trespass has resulted in trespassers being held liable for any damage inflicted on the land itself, even though not reasonably foreseeable, and physical injury to the possessor, his chattels on the land, and members of his family. W. Prosser, The Law of Torts, Ch. 3, § 13 (West 1971). The case law cited by Prosser does not show that this liability extends to loss of the land by foreclosure; and one Florida case suggests it may not extend, here, to consequential physical injury of the possessor that occurred nine days after the trespass, albeit the subject case is complicated by the issue of contributory negligence and predates Hoffman v. Jones, 280 So.2d 431 (Fla. 1973). See Leonard v. Nat Harrison Associates, 122 So.2d 432 (Fla. 2d DCA 1960).
Although monetary losses of the kind involved here are not closely analogous to the effects on health and comfort involved in Bialkowicz, we conclude that involuntary *1340 loss of the plaintiff's property likewise is not a natural or ordinary result of the type of trespass and/or negligence of which the defendants were, in the eyes of the jury, guilty. As to the nuisance claim, Bialkowicz is also helpful. Referring to the opinion in A & P Stores, Inc. v. Kornstein, 121 So.2d 701 (Fla. 3d DCA 1960), the Bialkowicz court explained that in that case it was proper to allow in evidence of inconveniences that had not been specially pleaded, because nuisance implies interference with beneficial enjoyment or use of one's property. The natural flow of damages resulting from the nuisance could thus reasonably be expected to include the inconveniences the plaintiffs in Kornstein were permitted to prove. In Kornstein the language used by the court was:
Since every complaint is considered to pray for general relief, we conclude that damages for loss of use [of plaintiffs' real property] are such as would reasonably be expected to flow from the allegations of the appellant.
121 So.2d at 705.
For nuisance, then, the test, to us, is whether the damages would reasonably be expected to flow from appellants' allegations. We hold that deprivation of beneficial enjoyment either cannot reasonably be expected to, or naturally and ordinarily will not, result in involuntary loss of property. Poux' loss of the farm is thus special damages that Poux failed to plead. The court should have sustained the defendants' objection to presentation of testimony on Poux' involuntary loss of the farm.
A somewhat different perspective is that of remoteness, of the element of damage sought, from the tort alleged. We find no Florida case having this focus that involves a tort and remote monetary damages, and therefore feel the classic foreign case of this genre is the most suitable authority, specifically Petition of Kinsman Transit Company, 388 F.2d 821 (2d Cir.1968) ("Kinsman II"). There, a vessel in the Buffalo River broke loose from its moorings and struck a second vessel. The second vessel likewise broke loose. Both ships drifted downstream and crashed into a bridge, which collapsed. The two vessels together with the bridge formed a dam, causing extensive flooding and an ice jam. This disrupted transportation on the river for about two months.
In an earlier case, Petition of Kinsman Transit Company, 338 F.2d 708 (2d Cir.1964) ("Kinsman I"), the appellate court had affirmed a finding of the City of Buffalo's negligence in not raising the bridge at the time of the mishap. It was also held that the damming of the river was a foreseeable consequence of the negligence of the city and of the owner of the first ship; and the owner of the second ship was also held accountable because, according to the court, although the exact developments were not a foreseeable result of that company's negligence, the risks taken that rendered that company's conduct negligent caused injury to the very class of persons to whom damage could be expected.
In Kinsman II, the question was whether added transportation and storage expenses incurred by two grain companies, which had to unload grain from their ships during the time the river transportation was disrupted, could be recovered from the negligent parties. The appellate court affirmed the trial court's refusal to award these damages. The appellate court held these injuries to the two firms were too remote or indirect a consequence of the defendants' negligence. 388 F.2d at 824. The court quoted its statement in Kinsman I that "somewhere a point will be reached when courts will agree that the link has become too tenuous  that what is claimed to be consequence is only fortuity," and suggested that whether the issue is couched in terms of foreseeability, duty, proximate cause or remoteness, we are in any case engaging in circumlocution. Id. at 824-25. Quoting Judge Andrews' famous dissent in Palsgraf v. Long Island *1341 Railroad, 248 N.Y. 339, 354, 355, 162 N.E. 99, 104 (1928), the Kinsman II court made it eminently clear that it is really a matter of trying expediently to achieve a fair judgment, while seeking to make a rule that is "practical and in keeping with the general understanding of mankind." (Another way of saying this is that we are dealing with a policy question.)
In sum, for either reason  the technical ground of special versus general damages and the necessary pleadings for special damages, or the remoteness of Poux' loss of the farm from the Aldermans' tort, it was improper for testimony on the involuntary loss of the Poux land to be admitted over the defendants' objection. Moreover, some indefinite portion of the damages awarded Poux must have been awarded for the loss of the real property.
Accordingly, the issue of the amount of damages to Poux must be retried, but not as to those items which were first raised at trial to which there was objection. By not pleading his theory, he is now precluded from doing so. As the Court said in Dober v. Worrell, 401 So.2d 1322, 1324 (Fla. 1981):
It is our view that a procedure which allows an appellate court to rule on the merits of a trial court judgment and then permits the losing party to amend his initial pleadings to assert matters not previously raised renders a mockery of the "finality" concept in our system of justice. Clearly, this procedure would substantially extend litigation, expand its costs, and if allowed, would emasculate summary judgment procedure.
Any retrial shall be solely upon damages for loss of personal property only, there being no objection at trial as to the increase in the number of animals and fowl lost about which the plaintiff testified. On remand, the plaintiff may amend the numbers in his pleadings to conform with his testimony.
LETTS, J., and FEDER, RICHARD Y., Associate Judge, concur.

UPON MOTION FOR REHEARING AND CLARIFICATION
GLICKSTEIN, Judge.
Rehearing is denied, but this court's opinion issued March 19, 1986, is clarified to reflect that the reversal of an award of damages for loss of ownership of the real property does not affect appellee Poux' right to present at the retrial, of the issue of damages only, evidence of general damages in nuisance. General damages in nuisance may include inconvenience and such temporary loss of use of part or all of the property as can be shown to stem from the nuisance. Loss of use of property as an aspect of general damages in nuisance is almost always temporary, if only because nuisances can, as a rule, be undone; it may not be a disguise for loss of ownership for default in payments.
LETTS, J., and FEDER, RICHARD Y., Associate Judge, concur.